UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

Yehuda “Jay” Adams, Plaintiff, Index No. 2:26-cv-4647

-against-

**VERFIED COMPLAINT**

GLOBAL BRIDGE TECHNOLOGIES, INC.;D/B/A TOP NOTCH
GLOBAL BRIDGE ADVISORS, LLC;
BLVD MEDICAL LLC;
ABC COMPANY (fictitious entity);
ROBERT FULTON ROOD IV; STEEL WHEELZ LLC;
GARY FIOCCO; and
JOHN DOES 1–10,
Defendants

----------------------------------------------------------------------X

Plaintiff Yehuda “Jay” Adams, by his attorney, alleges as follows:

## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the Racketeer Influenced and Corrupt Organizations Act (“RICO”), 18 U.S.C. §§ 1962, 1964(c).
2. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and complete diversity exists between Plaintiff and Defendants.
3. This Court has supplemental jurisdiction over Plaintiff’s related state-law claims under 28 U.S.C. § 1367(a).
4. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff’s claims occurred in this District, including Defendants’ transmission of compensation-related communications and payments into New York and Plaintiff’s performance of services from New York.
5. Plaintiff Yehuda “Jay” Adams is a citizen of the State of New York and is domiciled in Nassau County, New York.
6. Defendant Global Bridge Technologies, Inc. (“GBT”) is a corporation organized under the laws of the State of Florida with its principal place of business in Florida.

7. Defendant Global Bridge Advisors, LLC ("GBA") is a limited liability company whose upon information and belief, are citizens of states other than New York.
8. Defendant BLVD Medical LLC ("BLVD") is a limited liability company whose members, upon information and belief, include Defendant Robert Fulton Rood IV, a citizen of the State of Maryland, and Defendant Gary Fiocco, a citizen of the State of California, and may include no member who is a citizen of New York.
9. Defendant Steel Wheelz LLC ("Steel Wheelz") is a limited liability company whose citizenship is determined by the citizenship of its members. Upon information and belief, none of its members is a citizen of the State of New York.
10. Defendant Robert Fulton Rood IV is a citizen of the State of Maryland.
11. Defendant Gary Fiocco is a citizen of the State of California.
12. To the extent applicable, Maryland substantive law governs Plaintiff's wage-related claims under the parties' agreement and applicable New York choice-of-law principles.

**PARTIES**

15. Plaintiff Yehuda "Jay" Adams ("Plaintiff") is an individual domiciled in Nassau County, New York.
16. Defendant Global Bridge Technologies, Inc. ("GBT") employed Plaintiff, directly or indirectly, and conducted business throughout the United States, including within this District.
17. Defendant Global Bridge Advisors, LLC ("GBA") was affiliated with GBT and participated in Plaintiff's employment, payroll administration, compensation, and related business operations.
18. Defendant BLVD Medical LLC ("BLVD") participated in Plaintiff's employment, payroll administration, compensation, and related business operations and functioned as part of the integrated enterprise alleged herein.
19. Defendant Steel Wheelz LLC ("Steel Wheelz") is a limited liability company that, upon information and belief, issued compensation to Plaintiff and participated in Defendants' payroll administration, compensation practices, and business operations.
20. Defendant Robert Fulton Rood IV ("Rood") is an individual who, upon information and belief, exercised control over one or more of the entities

described above, including compensation decisions, payment routing, and related business operations.

21. Defendant Gary Fiocco ("Fiocco") is an individual who, upon information and belief, exercised control over one or more of the entities described above, including compensation decisions, payment routing, and related business operations.

22. Defendant ABC Company is a fictitiously named entity whose true name and legal status are presently unknown but which, upon information and belief, participated in Plaintiff's employment, payroll administration, compensation, fund transfers, business operations, or related conduct alleged herein. Plaintiff will amend this Complaint to substitute the proper party when its identity becomes known.

23. Defendants John Does 1-10 are presently unknown individuals and/or entities who, upon information and belief, participated in, directed, authorized, facilitated, controlled, or benefitted from the conduct alleged herein. Plaintiff will amend this Complaint to identify them when known.

## PRELIMINARY STATEMENT

24. This action arises from Defendants' failure to pay compensation they promised for Plaintiff's business development, sales, management, and operational services.

25. Defendants operated through affiliated entities, shifted payroll and compensation obligations among those entities, and used false and misleading payroll communications to obscure responsibility for Plaintiff's compensation and induce Plaintiff to continue working.

26. Plaintiff seeks relief under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962 and 1964(c), the Maryland Wage Payment and Collection Law, and related common-law causes of action, including breach of contract, fraud, and unjust enrichment

## .FACTUAL ALLEGATIONS

### Employment Relationship

27. On or about March 1, 2024, Plaintiff Yehuda "Jay" Adams entered into a written Employment Agreement with Defendant Global Bridge Advisors, LLC ("GBA"), pursuant to which GBA employed Plaintiff as Director of Global Business Development for the Company's All Things Tobacco & Global Sales ("TTGS") division and its then-contemplated wholly owned subsidiary, Global Bridge, Inc. ("GBI"), a Florida corporation. The Employment Agreement provided for an annual base salary of $250,000.00, payable monthly in accordance with GBA's regular payroll practices; required GBA, at the conclusion of each calendar quarter, to provide Plaintiff with a quarterly commissions sheet reflecting the prior quarter's transactions and the calculations used to determine Plaintiff's thirty-five percent (35%) participation in the net commissions and profits generated from sales resulting from Plaintiff's work; and required reimbursement of Plaintiff's reasonable business expenses incurred in the performance of his duties. A true and correct copy of the Employment Agreement is attached hereto as Exhibit A.
28. On April 3, 2025, Defendant Rood executed a written employment verification confirming Plaintiff's employment and compensation after Plaintiff's prospective landlord requested verification in light of concerns arising from Defendants' irregular and inconsistent payment practices, which had created inconsistencies in Plaintiff's compensation and payment history. A true copy of the letter is attached as Exhibit B.
29. Plaintiff fully performed his obligations, providing executive-level business development, sales, operational management, contract development, customer relations, and strategic consulting services that generated business opportunities and advanced Defendants' commercial operations throughout his employment.
30. Plaintiff regularly traveled to Maryland at Defendants' direction and performed substantial employment duties while physically present there, including in-person meetings with Defendant Rood, clients, prospective customers, and vendors in furtherance of Defendants' business development, sales, operational management, and strategic business activities. Those Maryland-based activities were an integral part of the services for which Defendants agreed to compensate Plaintiff

and further demonstrate that Plaintiff performed a substantial portion of his employment duties, at least in part, within the State of Maryland.

31. During periods when Plaintiff's compensation remained outstanding, Defendants repeatedly assured him that payment would be made promptly. In reliance on those representations, Plaintiff continued performing services and refrained from immediately seeking alternative employment or pursuing legal remedies.

Nonpayment and Irregular Payroll Practices

32. Defendants continued to accept and benefit from Plaintiff's services even as his earned compensation fell substantially into arrears.
33. Rather than compensating Plaintiff through a consistent payroll system, Defendants issued sporadic and partial payments through multiple entities and payment channels, including Global Bridge Advisors, LLC ("GBA"), Global Bridge Technologies, Inc. ("GBT"), BLVD Medical LLC ("BLVD"), and personal payment accounts associated with Defendants Rood and Fiocco.
34. Payments were transmitted through payroll deposits, wire transfers, Zelle, PayPal, and other channels without consistent wage statements, payroll records, or documentation identifying the entity responsible for each payment.
35. The use of multiple entities and personal payment accounts obscured which Defendant was responsible for Plaintiff's compensation, the amounts credited against Defendants' obligations, and the balance remaining due.
36. As a direct result of Defendants' repeated failure to pay Plaintiff timely and consistently, Plaintiff's payroll and income history did not accurately reflect the compensation he had earned.
37. When Plaintiff applied to rent an apartment, the landlord reviewed Plaintiff's income and payment history and treated his irregular payroll record as presenting an increased financial risk.
38. As a result, Plaintiff was required to provide a substantially larger security deposit than otherwise would have been required.
39. Plaintiff incurred that additional expense because Defendants failed to pay and document his compensation in a regular and timely manner.

Payroll Administration and False Representations

40. Defendants' irregular payroll practices also impaired Plaintiff's ability to demonstrate stable income and caused financial harm beyond the unpaid wages, commissions, bonuses, and reimbursements themselves.

41. Defendants Rood and Fiocco exercised direct control over compensation decisions, including the amount, timing, source, and method of payments made to Plaintiff.

42. In a December 3, 2025 written communication, Plaintiff identified payments issued through multiple corporate entities and personal payment channels and requested an accurate reconciliation of the compensation earned, amounts paid, sources of payment, and balance remaining due.

43. By approximately March 2026, Defendants owed Plaintiff at least $55,000 in unpaid wages, commissions, bonuses, and reimbursements, with the precise amount to be determined through discovery and accounting.

44. After months of delay, Defendants produced what they characterized as a reconciliation of the amounts paid and allegedly owed to Plaintiff.

45. The figures in that reconciliation were inconsistent with prior representations and were not supported by payroll ledgers, wage statements, payment registers, or other contemporaneous records.

46. Upon information and belief, the reconciliation was reconstructed after the fact rather than generated from complete and contemporaneously maintained payroll records.

47. Despite repeated written requests, Defendants failed to produce payroll ledgers, payroll registers, wage statements, accounting records, or other documentation sufficient to substantiate their calculations or rebut Plaintiff's estimate of the outstanding compensation.

48. In communications with Plaintiff, Defendants acknowledged that relevant payroll records were incomplete, unavailable, or nonexistent and that they could not reliably reconcile the compensation owed using their own records.

49. Nevertheless, Defendants attempted to minimize their liability by claiming that only limited pay periods remained outstanding, notwithstanding months of missed, partial, and irregular payments.

50. Defendants made intermittent partial payments, frequently after Plaintiff demanded payment or raised the prospect of legal action, while leaving substantial earned compensation unpaid.

51. On multiple occasions, Defendants represented that payments had been transmitted or were forthcoming when no payment had, in fact, been made.

52. Certain payments were transmitted only after Plaintiff challenged those representations and made additional demands for payment.

53. Plaintiff, through counsel, issued multiple written demands in December 2025 advising Defendants that earned compensation remained unpaid and requesting payment and supporting payroll records.

54. Defendants failed to cure the nonpayment or provide the requested records.

55. Instead, Defendants asked Plaintiff to reconstruct and reconcile the compensation owed using his own records, notwithstanding Defendants' obligation to maintain the relevant payroll and payment information.

56. After Plaintiff repeatedly demanded payment of his earned compensation and accurate payroll records, Defendants terminated Plaintiff's employment shortly thereafter. Plaintiff did not voluntarily resign. Prior to his termination, Defendants had not identified any material deficiency in Plaintiff's performance or any legitimate basis for refusing to pay his earned compensation

57. At the time of his termination, Plaintiff had developed numerous customer relationships, sales opportunities, pending transactions, and business-development initiatives that Defendants expected him to continue managing and expanding. Plaintiff reasonably expected to continue earning his agreed salary, together with commissions, bonuses, profit participation, and other incentive compensation associated with those existing and anticipated business opportunities.

58. Before terminating Plaintiff's employment, Defendants repeatedly requested that Plaintiff continue performing services, developing customer relationships, and generating revenue, while assuring Plaintiff that his outstanding compensation would be paid. In reliance on those assurances, Plaintiff continued performing his duties despite Defendants' failure to pay his earned compensation.

59. Rather than pay Plaintiff the compensation he had earned, Defendants terminated his employment after he repeatedly demanded payment, requested payroll records, and refused Defendants' request to backdate and recharacterize his employment relationship.

60. As a result, Plaintiff lost the opportunity to continue earning compensation, including commissions, bonuses, profit participation, and other incentive compensation associated with the customer relationships, transactions, business opportunities, and commercial initiatives that he had originated, developed, negotiated, managed, or materially advanced during his employment.

61. Prior to Plaintiff's termination, Defendants likewise did not identify any bona fide dispute regarding Plaintiff's performance or his entitlement to commissions or other earned compensation. Plaintiff was responsible for identifying, soliciting, cultivating, and maintaining customer and supplier relationships on Defendants' behalf and, through those efforts, developed supplier relationships that Defendants utilized in their business operations. Upon information and belief, after Plaintiff's termination, Defendants continued using supplier relationships developed through Plaintiff's efforts to source products sold through House of Epic, a website [1]owned and/or operated by Defendant Robert Rood, while failing and refusing to pay Plaintiff the commissions, profit participation, or other compensation Plaintiff alleges were due under the parties' Employment Agreement.

<u>Resulting Damages</u>

62. As a result of Defendants' conduct, Plaintiff suffered substantial financial harm, including unpaid wages, commissions, bonuses, expense reimbursements, and other earned compensation, together with cash-flow constraints, increased expenses, disruption of his financial obligations, and other consequential economic losses.

63. As a further result of Defendants' failure to pay Plaintiff's earned compensation when due, Plaintiff was unable to document regular income for purposes of

---

[1] https://houseofepic.com/

securing housing, which caused him to incur a larger apartment security deposit and related out-of-pocket costs.

64. Plaintiff had booked a cruise for his daughter's winter break, but he was unable to make a scheduled payment in September 2025 because Defendants had not paid compensation then due.

65. Although Plaintiff's original deposit was refundable, the reservation was cancelled, and the cost of booking a comparable trip thereafter increased substantially.

66. Plaintiff seeks the recoverable difference in cost and other consequential damages caused by Defendants' failure to pay earned compensation when due.

67. Plaintiff also seeks attorneys' fees and costs to the extent recoverable under applicable law.

68. As a direct and foreseeable consequence of Defendants' conduct, including their failure to pay Plaintiff's earned compensation, their repeated assurances that payment would be forthcoming, and Plaintiff's termination shortly after he demanded payment and payroll records, Plaintiff lost the opportunity to continue earning commissions, bonuses, profit participation, and other compensation associated with the customer relationships, transactions, business opportunities, and commercial initiatives that he had originated, developed, negotiated, managed, or materially advanced during his employment.

69. Many of the customer relationships, transactions, business opportunities, and commercial initiatives Plaintiff had originated, developed, negotiated, managed, or materially advanced remained active at the time of his termination. Before terminating Plaintiff, Defendants directed him to continue developing those opportunities and repeatedly assured him that his earned compensation would be paid. Plaintiff therefore reasonably expected to continue servicing those accounts and earning the commissions, bonuses, profit participation, and other compensation contemplated by the parties' arrangement as those opportunities matured and generated revenue.

70. Upon information and belief, after terminating Plaintiff's employment, Defendants continued using supplier relationships that Plaintiff had originated, developed, negotiated, or materially advanced to source products sold through House of Epic a website owned and/or operated by Defendant Robert Rood. Plaintiff alleges that those sales resulted, at least in part, from his efforts and that, under the Employment

Agreement, he was entitled to commissions, profit participation, and other compensation associated with those sales. Defendants nevertheless failed and refused to pay Plaintiff such compensation.

**Workplace Intimidation and Coercive Conduct**

71. During Plaintiff's employment, Defendants, acting through Fiocco and Rood, maintained an intimidating and coercive management style involving repeated verbal outbursts, threats concerning Plaintiff's continued employment, and pressure to follow Rood's directives despite Plaintiff's concerns regarding payroll, contracts, recordkeeping, and the orderly operation of the business.

72. Defendants demanded immediate compliance with their directives regardless of the surrounding circumstances.

73. On one occasion, while Plaintiff was attending to a family emergency after his grandmother suffered a serious fall and fractured her hip, Fiocco telephoned Plaintiff, screamed at him, and threatened to terminate his employment unless Plaintiff immediately returned Rood's call.

74. Plaintiff ordinarily returned Rood's calls promptly, generally within the same day and frequently within approximately one hour. Fiocco nevertheless demanded immediate compliance despite knowing that Plaintiff was attending to a serious family emergency.

75. Plaintiff repeatedly attempted to improve Defendants' operations by recommending greater organization, written procedures, properly documented contracts, accurate payroll practices, and improved recordkeeping.

76. Rather than address those concerns, Fiocco regularly yelled at Plaintiff, insisted that matters had to be handled "Rob's way," and warned that Plaintiff's continued complaints or efforts to impose structure would jeopardize his employment.

77. Fiocco repeatedly told Plaintiff that "Rob is a genius," that "now we're family," and that business had to be conducted "the family way."

78. Those statements were made while Fiocco was directing Plaintiff not to question Defendants' payroll practices, contract administration, compensation decisions, or other business operations and to follow Defendants' directives without objection.

79. On multiple occasions, when Plaintiff questioned Defendants' business practices, payroll procedures, contract administration, or organizational deficiencies, Fiocco warned that "bad things" would happen if Plaintiff failed to comply with Defendants' expectations.

80. In the context in which they were made, Plaintiff reasonably understood those statements as threats intended to discourage him from insisting upon accurate payroll practices, proper recordkeeping, contractual compliance, and lawful business procedures.

81. Defendants' threats of termination, coercive conduct, and repeated assurances of payment caused Plaintiff to continue performing valuable services and to delay pursuing legal remedies despite continuing payroll irregularities and unpaid compensation.

82. These facts further demonstrate Defendants' control over Plaintiff's employment and their course of conduct in inducing him to continue working while compensation remained unpaid.

Common Ownership, Control, and Operation

83. Publicly available Department of Justice records, attached as Exhibits C (Rood Pleading guilty) and D (sentencing), establish that Defendant Rood pleaded guilty in federal court to conspiracy to commit wire fraud arising from conduct involving the concealment of rerouted funds, misrepresentations concerning the status of financial transactions, and the preparation of a false report when questions were raised regarding those transactions. Those records further establish that Rood was sentenced to a term of 120 months' imprisonment.

84. Public judicial records, attached as Exhibits E (bankruptcy court) and Exhibit F (Circuit court denying relief) further establish that Rood was found liable in bankruptcy-related proceedings for fraud, civil conspiracy, fraudulent conveyance, and related misconduct, resulting in judgments exceeding $16 million. Those judgments were affirmed by the United States District Court for the District of Maryland and the United States Court of Appeals for the Fourth Circuit, and the underlying debts were determined to be nondischargeable in bankruptcy.

85. During Plaintiff's employment, Plaintiff repeatedly asked Defendant Rood why Defendant Fiocco was identified as the owner and/or principal of one or more affiliated entities when Rood had repeatedly represented that he owned, controlled, and directed those entities. Rood responded only that "there are reasons." When Plaintiff asked

whether those reasons included the prior judgments and criminal proceedings described above, Rood responded that they were "part of it," while adding that there were "other reasons" as well.

86. Plaintiff does not rely on the foregoing criminal and civil proceedings to establish liability in this action or to suggest that Defendants acted in conformity with prior conduct. Plaintiff alleges those proceedings only because Rood expressly identified them as part of the explanation for the ownership structure used by Defendants. They provide relevant context for Plaintiff's understanding of Defendants' ownership structure, payroll practices, allocation of responsibility among affiliated entities, and Rood's actual operational and financial control.

87. Defendant Rood exercised direct and substantial control over the operations, finances, compensation practices, and payment activities of GBT, GBA, and BLVD, including directing how Plaintiff's compensation was calculated, when it would be paid, and which entity or account would be used to make payment.

88. Defendant Rood also directed the payment of Plaintiff's compensation through affiliated entities and payment channels, controlled the timing and source of payments, and repeatedly assured Plaintiff that payment would be made while Plaintiff's earned compensation remained unpaid.

89. Defendant Gary Fiocco was copied on communications concerning Plaintiff's compensation and payment status, personally transmitted Zelle payments to Plaintiff from personal and affiliated-entity accounts under his control, participated in discussions concerning Plaintiff's payroll and compensation, and exercised authority over the timing, source, and method of payments made to Plaintiff. In those discussions, Fiocco represented that he was "the money man," reflecting his control over compensation and payment decisions.

90. Fiocco also exercised managerial authority over Plaintiff, participated in payroll and compensation discussions, communicated directly with Plaintiff concerning outstanding compensation, and participated in decisions regarding the timing, amount, source, and method of Plaintiff's payments, including the routing of those payments through accounts under his control.

91. Upon information and belief, one or more of the corporate entities were inadequately capitalized or were operated in a manner that left them unable to satisfy compensation obligations incurred for Plaintiff's services.

92. Plaintiff's compensation was not paid through a single identified employer. Payments were instead issued interchangeably through GBT, GBA, BLVD, and associated accounts associated with Rood and Fiocco.

93. Those payments were made through payroll deposits, wire transfers, Zelle, PayPal, and other payment methods without a consistent payroll structure or reliable documentation identifying the obligor or the compensation period to which each payment applied.

94. Defendants failed to maintain or produce centralized and consistent payroll and compensation records identifying the entity that employed Plaintiff, the entity responsible for each component of his compensation, and the source of each payment.

95. Defendants also requested that Plaintiff backdate his agreement and substitute Plaintiff's business entity as the purported contracting party in place of Plaintiff individually. Plaintiff refused. Upon information and belief, Defendants made that request to recharacterize Plaintiff as an independent contractor rather than a salaried employee and to avoid or obscure their obligations to pay Plaintiff's earned compensation and satisfy applicable employer payroll tax and withholding obligations. Exhibit G

96. Upon information and belief, Rood and Fiocco operated and managed the affiliated entities as components of a single integrated enterprise under centralized control and utilized those entities interchangeably in connection with Plaintiff's employment, payroll, compensation, and Defendants' business operations.

97. Upon information and belief, the entities shared office locations or overlapping business addresses, management, personnel, financial resources, financial accounts, payment channels, and business operations.

98. Upon information and belief, Defendants shifted payroll obligations and business expenses among affiliated entities without consistently identifying which entity employed Plaintiff or was responsible for his compensation.

99. Upon information and belief, Fiocco and Rood directed payments to Plaintiff through affiliated entities and corporate and personal payment channels in a manner that obscured the entity responsible for Plaintiff's compensation and prevented the maintenance of a complete and reliable accounting of the amounts owed to Plaintiff.

100. Upon information and belief, Rood exercised domination and control over the affiliated entities in connection with the conduct alleged herein, including withholding Plaintiff's earned compensation, directing payments through affiliated entities and multiple payment channels, and obscuring the identity of the entity responsible for Plaintiff's compensation.

101. Upon information and belief, one or more of the affiliated entities were inadequately capitalized or otherwise operated in a manner that left them unable to satisfy compensation obligations incurred for Plaintiff's services.

102. The foregoing facts further demonstrate that Defendants exercised centralized control over Plaintiff's employment, compensation, payroll administration, and business operations and utilized affiliated entities interchangeably to induce Plaintiff to continue performing services while substantial earned compensation remained unpaid.

Representative False Payment Communications

103. The communications described below are representative examples of Defendants' repeated assurances concerning Plaintiff's compensation, payroll reconciliation, payment timing, payment routing, and the status of earned compensation. Plaintiff alleges that Defendants made materially similar representations through numerous additional text messages, emails, electronic payment communications, and other interstate communications during the relevant period, and that the examples set forth below are illustrative rather than exhaustive.

104. On or about July 12 2025 Defendant Rood sent Plaintiff an electronic communication stating, in substance, that Plaintiff's payroll payment had been made from BLVD Medical LLC with a reference to "TopNotch," and further representing that the funds "should be in your account" or should appear momentarily. Plaintiff alleges that this communication was significant because Rood acknowledged that Plaintiff's compensation was being routed through BLVD Medical LLC rather than through the entity by which Plaintiff had been employed. This communication is representative of Defendants' practice of directing payroll and compensation through multiple affiliated entities and payment channels in a manner that obscured the identity of the entity responsible for Plaintiff's wages and compensation. A true copy is attached as Exhibit H.

105. On or about October 3, 2025, Defendants communicated to Plaintiff by text message and other electronic communications that Plaintiff's payroll had not yet been deposited but would be paid shortly, including by the following Monday. Plaintiff alleges that, at the time those representations were made, Defendants knew or recklessly disregarded that the promised payment would not be made within the timeframe represented, and the payment was not made as represented. A true copy is attached as Exhibit I

106. On or about December 1, 2025, Plaintiff sent written notice to Defendant Fiocco concerning repeated unfulfilled payment commitments and substantial compensation that remained unpaid. Despite receiving that notice, Defendants continued to represent that payment would be forthcoming without paying the outstanding compensation or providing a concrete payment schedule. A true copy is attached as Exhibit J

107. On or about March 4, 2026, Defendants sent Plaintiff an email terminating his employment, stating that the parties' agreement was terminated, that the payment made that day constituted Plaintiff's final payment, and that any remaining amount owed would be addressed later. Plaintiff alleges that Defendants' representation that the remaining balance would subsequently be resolved was materially false and misleading because Defendants knew that substantial earned compensation remained outstanding and did not intend to establish or implement any meaningful process to determine or pay the amounts due. A true copy is attached as Exhibit K.

108. Prior to Plaintiff's termination, Plaintiff relied on Defendants' repeated representations that his earned compensation would be paid and that any outstanding amounts would be resolved. In reliance on those representations, Plaintiff continued performing executive-level services, developing customer relationships, and pursuing business opportunities for Defendants, while refraining from seeking alternative employment or promptly pursuing legal remedies. Despite acknowledging in the March 4, 2026 termination email that additional amounts remained owing, Defendants did not thereafter establish or implement any meaningful process to determine or pay the outstanding compensation.

<u>Customer Deposits, Delayed Deliveries, and Related Conduct</u>

109. During Plaintiff's employment, Plaintiff identified and brought in customers whose deposits and anticipated sales benefited Defendants' business.

110. On those occasions, Defendants accepted customer deposits while representing, directly and indirectly, that the products would be timely procured, manufactured, and delivered.

111. On information and belief, Defendants knew at the time those representations were made that they lacked the funds, logistics, or willingness necessary to complete performance as promised, but nevertheless used Plaintiff's customer relationships to obtain deposits and maintain the appearance of a functioning business.

112. On at least one occasion, Defendant Robert Fulton Rood IV failed to timely remit the payment required to the manufacturer, which caused the products not to be produced or delivered when promised.

113. When the products were not delivered and a refund was requested, Defendants did not promptly return the deposit, but instead withheld the customer's money for an extended period.

114. Plaintiff was forced to address customer complaints and explain delivery and refund problems even though he had no authority over Defendants' payment decisions, manufacturer relationships, or fulfillment practices.

115. Plaintiff was required to communicate with customers regarding delayed deliveries and refund requests despite having no authority over Defendants' payment decisions, manufacturer relationships, or fulfillment practices, and customers associated those failures with Plaintiff personally, which damaged Plaintiff's credibility, professional reputation, and customer relationships.

116. Defendants did not disclose to Plaintiff or to customers the true reasons for the delays, including the failure to make required payments to manufacturers or the identities of the entities responsible for fulfilling customer orders.

117. Upon information and belief, Defendants' acceptance of customer deposits, repeated delivery failures, delayed refunds, and shifting of responsibility among affiliated entities and individuals were recurring business practices, rather than isolated mistakes, and used to induce continued customer confidence, preserve Plaintiff's role as the face of the business, and conceal Defendants' inability or unwillingness to perform and refund customer money on a timely basis.

118. As a direct and proximate result of this conduct, Plaintiff suffered harm to his reputation, goodwill, and standing in the industry, lost and damaged customer relationships, and other consequential damages.

## CAUSES OF ACTIONS

## FIRST CAUSE OF ACTION

### Violation of the Maryland Wage Payment & Collection Law ("MWPCL") (Md. Code Lab. & Emp. §§ 3-501 et seq.)

119. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

120. Defendants employed Plaintiff within the meaning of the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§ 3-501 et seq., and the Employment Agreement required Defendants to pay Plaintiff an annual base salary of $250,000.00, payable monthly, together with quarterly commission-based compensation consisting of Plaintiff's thirty-five percent (35%) participation in net commissions and profits generated from sales resulting from Plaintiff's work as Director of Global Business Development.

121. The salary, commissions, and payout participation described above constituted wages and other remuneration earned by Plaintiff for services performed on Defendants' behalf. Plaintiff also earned reimbursement of reasonable business expenses pursuant to the Employment Agreement.

122. Plaintiff earned the salary, commission-based compensation, payout participation, and reimbursable expenses alleged herein, and Defendants failed to pay all such amounts when due.

123. Defendants further failed to provide the quarterly commission statements contemplated by the Employment Agreement, which were required to identify the prior quarter's transactions and calculate Plaintiff's payout participation.

124. Defendants repeatedly acknowledged that Plaintiff's compensation remained outstanding, assured Plaintiff that payment would be made, accepted and retained

the benefits of Plaintiff's services, and supplier relationships, and nevertheless withheld wages and other earned compensation that had become due.

125. Defendants also terminated Plaintiff after he demanded payment of earned compensation and supporting payroll and commission records, thereby leaving unpaid wages outstanding at the time of termination.

126. Upon information and belief, after Plaintiff's termination, Defendants continued using supplier relationships Plaintiff originated, developed, negotiated, or materially advanced to source products sold through House of Epic. Plaintiff alleges that those sales resulted, at least in part, from his efforts and generated commissions and payout participation due under the Employment Agreement, which Defendants failed and refused to pay.

127. Defendants' failure to pay Plaintiff's earned wages was not the result of a bona fide dispute. Rather, Defendants repeatedly acknowledged that Plaintiff's compensation remained outstanding, assured Plaintiff that payment would be made, continued accepting the benefits of Plaintiff's work, and the supplier relationship he developed, and nevertheless intentionally failed and refused to pay the earned wages due.

128. Pursuant to Md. Code Ann., Lab. & Empl. § 3-507.2, Plaintiff is entitled to recover the unpaid wages, an additional amount not exceeding three times the wage award if the Court finds the withholding was not the result of a bona fide dispute, attorneys' fees, costs, and such other relief as the Court deems just and proper.

129. Plaintiff seeks judgment against Defendants, jointly and severally, for all unpaid wages and other compensation due under the Employment Agreement and the Maryland Wage Payment and Collection Law, together with any statutory enhancement, prejudgment interest to the extent recoverable, attorneys' fees, costs, and such other relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION

### Breach of Contract

130. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

131. Plaintiff and Defendant Global Bridge Advisors, LLC ("GBA") entered into the Employment Agreement. Under the Employment Agreement, GBA agreed to employ Plaintiff as Director of Global Business Development for the Company's All Things Tobacco & Global Sales ("TTGS") division and the then-contemplated wholly owned subsidiary, Global Bridge, Inc. ("GBI"), pay Plaintiff an annual base salary of $250,000.00, payable monthly in accordance with GBA's regular payroll practices, provide Plaintiff, at the conclusion of each calendar quarter, with a quarterly commission statement reflecting the prior quarter's transactions and the calculations used to determine Plaintiff's thirty-five percent (35%) participation in the net commissions and profits generated from sales resulting from Plaintiff's work, reimburse Plaintiff for all reasonable business expenses incurred in the performance of his duties, and pay all other compensation due under the Employment Agreement.

132. .Plaintiff fully performed all obligations required of him under the Employment Agreement, except to the extent further performance was prevented or excused by Defendants' material breaches. At all relevant times, Plaintiff remained ready, willing, and able to continue performing his obligations under the Employment Agreement until Defendants prevented further performance by terminating his employment.

133. Defendants materially breached the Employment Agreement by failing and refusing to pay all salary, commissions, payout participation, reimbursements, and other compensation owed to Plaintiff under the Agreement, including compensation tied to sales resulting from Plaintiff's work. Defendants also breached the Agreement by failing to provide the quarterly commission statements required to show the calculations used to determine Plaintiff's thirty-five percent (35%) participation in the net commissions and profits generated during the prior quarter.

134. Defendants further breached the Employment Agreement by terminating Plaintiff after he demanded payment of earned compensation and supporting payment records. The Employment Agreement contains no express provision authorizing Defendants to terminate Plaintiff's employment without notice or cause. Defendants' termination prevented Plaintiff from continuing to perform and

earn the salary, commissions, payout participation, and other compensation contemplated by the Employment Agreement.

135. Upon information and belief, after Plaintiff's termination, Defendants continued using supplier relationships Plaintiff originated, developed, negotiated, or materially advanced to source products sold through House of Epic, a website owned and/or operated by Defendant Robert Rood. Plaintiff alleges that those sales resulted, at least in part, from his work and that, under the Employment Agreement, he was entitled to the commissions, payout participation, and other compensation associated with those sales. Defendants nevertheless failed and refused to pay Plaintiff such compensation.

136. As a direct and proximate result of Defendants' breaches, Plaintiff has suffered damages including, but not limited to, unpaid salary, unpaid commissions, unpaid payout participation, unreimbursed business expenses, and other compensation due under the Employment Agreement, together with prejudgment interest to the extent recoverable, costs, and such other damages as may be proven at trial.

137. Plaintiff seeks judgment against Defendants, jointly and severally, for all damages sustained as a result of the breaches alleged herein, together with prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

## THIRD CAUSE OF ACTION

### Unjust Enrichment

138. Plaintiff repeats and realleges each and every preceding allegation as though fully set forth herein.

139. Plaintiff pleads this claim in the alternative pursuant to Fed. R. Civ. P. 8(d), to the extent Defendants dispute the existence, enforceability, applicability, or scope of the Employment Agreement, or contend that Plaintiff's compensation, services, customer relationships, supplier relationships, or business opportunities are not governed by an express contract.

140. Defendants knowingly accepted and retained the benefit of Plaintiff's executive, sales, business-development, and customer-development services,

including the customer relationships, supplier relationships, and business opportunities he originated, developed, negotiated, or materially advanced, as well as the revenues, commissions, profits, and other economic benefits derived from those efforts.

141. Plaintiff rendered those services and conferred those benefits with the reasonable expectation of receiving the compensation promised by Defendants or, alternatively, the reasonable value of the benefits conferred. Defendants failed to pay Plaintiff the full compensation owed, including salary, commissions, payout participation, reimbursable business expenses, and compensation associated with House of Epic sales and related business opportunities.

142. Upon information and belief, after Plaintiff's termination, Defendants continued exploiting the customer relationships, supplier relationships, and business opportunities Plaintiff developed, including sales through House of Epic, while failing to compensate Plaintiff for the value of those retained benefits.

143. Despite Plaintiff's repeated demands for payment and requests for supporting compensation records, Defendants refused to provide the requested information, terminated Plaintiff's employment, retained the benefits of Plaintiff's work, and continued exploiting the customer relationships, supplier relationships, and business opportunities Plaintiff developed without providing full compensation.

144. Under these circumstances, Defendants have been unjustly enriched at Plaintiff's expense, and equity and good conscience require Defendants to disgorge and make restitution for the value of the benefits they knowingly accepted and retained without providing full compensation.

## <u>FOURTH CAUSE OF ACTION</u>

### Promissory Estoppel

145. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

146. Plaintiff pleads this claim in the alternative pursuant to Fed. R. Civ. P. 8(d) to the extent Defendants dispute the existence, validity, enforceability, applicability,

or scope of the Employment Agreement, or contend that some or all of the promises alleged herein are not governed by an express contract.

147. Before Plaintiff entered into and while performing under the Employment Agreement, Defendants, including through Robert Rood and other agents acting on Defendants' behalf, repeatedly promised and assured Plaintiff that he would be timely paid the compensation promised under the parties' arrangement, including his salary, commissions, payout participation, expense reimbursements, and other compensation. Defendants further repeatedly assured Plaintiff that any outstanding compensation would be paid and encouraged Plaintiff to continue performing his duties notwithstanding delays in payment.

148. Plaintiff reasonably relied upon those promises and assurances by entering into the Employment Agreement, accepting the position, foregoing other employment and business opportunities, continuing to perform his duties despite Defendants' repeated failures to timely pay him, continuing to develop customer, supplier, and business relationships for Defendants' benefit, and refraining from taking immediate legal action or other collection efforts in reliance upon Defendants' repeated assurances that payment would be forthcoming. In continuing to perform, Plaintiff also reasonably relied upon the parties' ongoing employment relationship and had no reason to anticipate that Defendants would terminate his employment immediately after he demanded payment of earned compensation.

149. Defendants nevertheless failed to honor their promises by withholding Plaintiff's earned compensation, refusing to provide requested compensation records, terminating Plaintiff shortly after he demanded payment of earned compensation, and, upon information and belief, continuing to exploit the business relationships and opportunities Plaintiff developed without providing the promised compensation.

150. Plaintiff suffered substantial detriment as a direct and proximate result of his reliance on Defendants’ promises and assurances, including lost compensation, lost opportunity to continue earning compensation under the Employment Agreement, unreimbursed expenses, and other resulting damages.

151. Injustice can be avoided only by enforcing Defendants' promises and awarding Plaintiff damages resulting from his reasonable reliance.

152. Plaintiff seeks judgment against Defendants, jointly and severally, for all damages caused by Defendants' promissory conduct, together with prejudgment interest to the extent recoverable, costs, and such other and further relief as the Court deems just and proper.

## FIFTH CAUSE OF ACTION

**Fraud**

153. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

154. Defendants Rood and Fiocco, acting individually and through the affiliated entities they owned, controlled, managed, and operated, made material misrepresentations of existing fact and present intent to Plaintiff concerning payroll, compensation, recordkeeping, and the administration of Plaintiff's employment.

155. These misrepresentations included, without limitation, statements that:

(a) payroll records existed and would be produced;

(b) a reconciliation of amounts owed was underway and would be provided;

(c) payments had been transmitted when, in fact, they had not;

(d) Plaintiff had agreed to defer or extend payment deadlines when he had not;

(e) only limited payroll periods remained outstanding when additional compensation remained unpaid; and

(f) additional payments, including "double payroll" payments, would be made by specified dates to cure payroll arrears.

156. Defendants Rood and Fiocco repeatedly represented that Plaintiff's earned compensation would be paid promptly, that payroll discrepancies would be reconciled, and that supporting payroll documentation would be provided. Those representations were not isolated statements but were repeated on numerous occasions throughout Plaintiff's employment whenever Plaintiff requested payment, payroll reconciliation, or supporting payroll documentation. At the same time, they discouraged Plaintiff from questioning payroll practices, insisting upon payroll records, or pursuing legal remedies, and instead urged him to continue performing services in reliance upon those assurances.

157. After Plaintiff questioned the accuracy of payroll records and demanded supporting documentation, Rood and Fiocco continued representing that payment was forthcoming, that payroll reconciliation was underway, and that supporting payroll documentation would be provided, rather than disclosing that those representations were false.

158. At the time these representations were made, Rood and Fiocco knew they were false, lacked any present intent to perform as represented, or made such representations with reckless disregard for their truth. Rood and Fiocco intended that Plaintiff rely upon those representations by continuing to provide services, delaying legal action, and foregoing alternative employment and business opportunities.

159. The foregoing representations concerned existing facts and Defendants' present intent, not merely future contractual performance. They concerned whether payroll records existed, whether payroll reconciliation was actually underway, whether payments had in fact been transmitted, whether Plaintiff had agreed to defer payment, and whether Rood and Fiocco presently intended to honor their repeated promises of prompt payment. Those misrepresentations independently induced Plaintiff to continue rendering services and delay legal remedies despite Defendants' continuing failure to pay earned compensation.

160. Plaintiff reasonably and justifiably relied upon Rood's and Fiocco's representations by continuing to perform executive, operational, sales, and business development services, including servicing customer relationships and generating business opportunities on Defendants' behalf; continuing to work with

the reasonable expectation that Defendants would honor their repeated representations concerning payment and payroll reconciliation; delaying legal action in reliance upon those repeated assurances; and foregoing other employment and business opportunities.

161. Plaintiff further alleges, upon information and belief, that Defendants structured and operated affiliated business entities in a manner that obscured responsibility for payroll, compensation, and financial obligations. Plaintiff further alleges that Defendant Rood exercised actual financial and operational control over those entities while Defendant Fiocco was identified or held out as the owner or operator of certain entities, thereby obscuring responsibility for the payroll and compensation practices alleged herein.

162. In furtherance of the foregoing conduct, Defendants utilized multiple affiliated entities for payroll and compensation and caused payments to be made through different entities, accounts, and payment channels, thereby obscuring responsibility for Plaintiff's compensation and payroll obligations.

163. Plaintiff further alleges that, during his employment, he personally observed occasions on which customer deposits were retained despite delayed production, delayed deliveries, and delayed refunds while Rood and Fiocco continued representing that performance would occur despite those delays. Plaintiff relies upon these observations solely as circumstantial evidence of Defendants' knowledge and intent concerning the representations made to Plaintiff regarding payroll, compensation, and financial obligations, and not as independent claims arising from any customer transaction.

164. Plaintiff further alleges that Defendants terminated him after he questioned payroll accounting, payment procedures, supporting records, and the retention of profits and other benefits generated by his work. Plaintiff alleges that the termination was intended, at least in part, to prevent further inquiry, discourage demands for reconciliation and documentation, and permit Defendants to continue retaining the financial benefits of Plaintiff's work without paying the compensation owed.

165. Upon information and belief, Defendants' repeated misrepresentations and omissions were part of a continuing scheme to induce Plaintiff to accept and

continue employment, devote substantial time, skill, and effort to developing Defendants' business, customer relationships, supplier relationships, and sales opportunities, and to refrain from pursuing legal remedies while Defendants retained the benefits of Plaintiff's work. After Plaintiff demanded payment and supporting compensation records, Defendants terminated his employment and continued using the business relationships and opportunities Plaintiff had originated, developed, negotiated, or materially advanced, including through House of Epic, while retaining the resulting revenues, commissions, profits, and other economic benefits without providing Plaintiff the promised compensation.

166. As a direct and proximate result of Rood's and Fiocco's fraudulent conduct, Plaintiff sustained damages including unpaid salary, commissions, bonuses, other earned compensation, consequential financial losses, out-of-pocket expenses, lost employment and business opportunities, injury to his professional reputation and goodwill, and other damages to be proven at trial.

167. Plaintiff is entitled to recover compensatory damages, pre- and post-judgment interest, attorneys' fees to the extent recoverable by law, costs, and such other and further relief as the Court deems just and proper.

## SIXTH CAUSE OF ACTION

## EQUITABLE ACCOUNTING OF COMPENSATION AND COMMISSIONS

168. Plaintiff repeats and realleges each and every preceding allegation as though fully set forth herein.

169. Plaintiff pleads this equitable claim in the alternative to the extent Defendants dispute the existence, amount, source, ownership, allocation, or disposition of funds used to compensate Plaintiff.

170. Defendants maintained exclusive possession, custody, and control of the payroll records, accounting records, compensation records, banking records, payment records, and other financial information necessary to determine accurately Plaintiff's compensation and the source of payments made on his behalf.

171. Defendants used multiple entities, accounts, and payment channels in connection with Plaintiff's compensation, including Global Bridge Technologies, Inc., Global Bridge Advisors, LLC, BLVD Medical LLC, and personal accounts or payment channels associated with Defendants Rood and Fiocco.

172. Upon information and belief, Defendants utilized overlapping entities, accounts, and payment channels in a manner that obscured the source, ownership, allocation, and disposition of funds used to compensate Plaintiff and frustrated Plaintiff's ability to determine the responsible payor or payors.

173. Defendants failed to maintain, preserve, or produce complete and accurate records sufficient to determine the wages Plaintiff earned, the payments made to him, the source of each payment, the entity responsible for each payment, and the balance remaining due.

174. Defendants also failed and refused to provide the quarterly commission statements, commission calculations, payout participation calculations, payroll documentation, and supporting records required under the parties' compensation arrangement, despite Plaintiff's repeated requests, thereby preventing Plaintiff from independently determining the amount of compensation earned and owed.

175. Plaintiff repeatedly requested payroll records, payment documentation, commission calculations, compensation records, and other supporting information necessary to reconcile the amounts earned and paid. Defendants refused to provide those materials, leaving Plaintiff unable to verify the accuracy of Defendants' compensation calculations or determine the full amount owed.

176. Because the information necessary to determine Plaintiff's compensation, commissions, payout participation, reimbursements, and other amounts owed resides almost exclusively within Defendants' possession, custody, and control, Plaintiff cannot accurately determine the full amount of compensation owed, the identity of the responsible payor or payors, or the allocation and disposition of funds without an equitable accounting.

177. Accordingly, Plaintiff seeks an order directing Defendants to render a full and verified accounting sufficient to determine the compensation earned by

Plaintiff, including all payroll records, payroll registers, payroll journals, commission statements, commission calculations, payout participation calculations, reimbursement records, general ledger entries, bank records reflecting compensation payments, invoices, sales reports, customer relationship management records, and other financial records necessary to determine Plaintiff's compensation, including transactions that continued, closed, renewed, or otherwise generated revenue after Defendants stopped paying Plaintiff or after Plaintiff's employment ended.

178. Upon information and belief, Defendants possess books, records, invoices, purchase records, supplier records, sales records, customer records, revenue reports, commission records, profit calculations, payroll records, banking records, and other financial information relating to House of Epic and related business opportunities developed by Plaintiff, all of which are necessary to determine Plaintiff's compensation and payout participation. Those records are further necessary to determine the extent to which revenues, profits, renewals, repeat business, and other economic benefits continued to be generated from Plaintiff's work after Defendants ceased paying Plaintiff or after his employment ended.

179. The accounting shall also include all sales, renewals, contracts, customer relationships, supplier relationships, revenue opportunities, commissions, bonuses, payout participation, profits, and other compensation attributable to transactions Plaintiff originated, developed, negotiated, managed, or materially advanced, including transactions conducted through House of Epic and any related business lines after Defendants ceased paying Plaintiff or after Plaintiff's employment ended.

180. Upon information and belief, the financial records necessary to determine Plaintiff's compensation are dispersed among Global Bridge Advisors, LLC, Global Bridge Technologies, Inc., BLVD Medical LLC, and accounts controlled by Defendants Rood and Fiocco. Accordingly, only Defendants possess the information necessary to determine which entity received the revenues generated by Plaintiff's work, which entity was responsible for

compensating Plaintiff, the amounts that remain due, and the allocation of those revenues and obligations among the affiliated entities.

181. Upon information and belief, Defendants have continued to receive revenues, profits, renewals, repeat business, and other economic benefits arising from customer relationships, supplier relationships, contracts, and business opportunities Plaintiff originated, developed, negotiated, managed, or materially advanced, the full extent of which cannot be determined without an equitable accounting.

182. An equitable accounting is necessary not only to determine the amount of compensation owed to Plaintiff, but also to identify the proper entity or entities responsible for such compensation, reconcile the flow of funds among the affiliated Defendants, determine the revenues and profits generated from Plaintiff's work, and prevent Defendants from benefiting from the use of multiple entities or payment channels to obscure their respective financial obligations.

## SEVENTH CAUSE OF ACTION

**Violation of Article 6 of the New York Labor Law (N.Y. Lab. Law §§ 191, 198)**

183. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

184. This cause of action is pleaded strictly in the alternative pursuant to Fed. R. Civ. P. 8(d). Plaintiff does not concede that New York law governs all or any portion of his employment, but asserts this claim solely to the extent the Court determines that Article 6 of New York Labor Law governs any portion of the employment relationship, services performed or compensation at issue.

185. During the course of his employment, Plaintiff performed substantial work and services within the State of New York.

186. At all relevant times, each Defendant was Plaintiff’s employer and/or joint employer within the meaning of Article 6 of the New York Labor Law, and exercised direct or indirect control over the terms and conditions of Plaintiff’s employment, including compensation, payroll, supervision, scheduling and the

authority to hire, and fire, and the manner and means by which Plaintiff performed his work.

187. On or about March 1, 2024, Plaintiff commenced employment pursuant to an agreement providing for an annual salary of $250,000, together with bonuses and commissions.

188. On or about April 3, 2025, Defendant Rood executed a written employment verification confirming Plaintiff's employment and compensation.

189. Plaintiff fully performed his obligations by providing executive-level business development, sales, operational management, contract development, customer-relations, and strategic consulting services, generating business opportunities, and advancing Defendants' commercial operations throughout his employment.

190. Plaintiff earned salary, and other earned compensation, including commissions, incentive compensation, and other remuneration that constitute "wages" within the meaning of Article 6 of the New York Labor Law, to the extent applicable, that became due and payable under the parties' agreements and applicable law.

191. Defendants failed to pay Plaintiff all earned wages and compensation in accordance with the timing and payment requirements of Article 6 of the New York Labor Law, including, to the extent applicable, N.Y. Lab. Law § 191. Defendants further failed to timely pay wages when due, made late, partial, and irregular payments, and failed to pay certain earned wages and compensation altogether.

192. Rather than compensating Plaintiff through a consistent payroll system, Defendants issued sporadic and partial payments through multiple entities and payment channels, including Global Bridge Advisors, LLC ("GBA"), Global Bridge Technologies, Inc. ("GBT"), BLVD Medical LLC ("BLVD"), and personal payment accounts associated with Defendants Rood and Fiocco.

193. Defendants' payroll, reconciliation, and accounting records reflected, or should have reflected, the entity responsible for each payment, the amounts credited against Defendants' obligations, and the compensation remaining due.

194. The use of multiple entities and personal payment accounts obscured which Defendant was responsible for Plaintiff's compensation, the amounts credited against Defendants' obligations, and the balance remaining due.

195. .Defendants' irregular payroll practices impaired Plaintiff's ability to document his compensation history and caused foreseeable economic harm, including increased housing costs and other financial losses.

196. Defendants' irregular payment practices also impaired Plaintiff's ability to document the full amount of compensation earned and due.

197. Plaintiff, through counsel, issued multiple written demands in December 2025 advising Defendants that earned compensation remained unpaid and requesting payment, payroll records, payroll reconciliation and supporting compensation documentation.

198. Defendants failed to cure the nonpayment or provide the requested records.

199. Instead, Defendants asked Plaintiff to reconstruct and reconcile the compensation owed using his own records, notwithstanding Defendants' obligation to maintain the relevant payroll and payment information.

200. After Plaintiff repeatedly demanded payment of his earned compensation and accurate payroll records, Defendants terminated his employment.

201. At no time before Plaintiff demanded payment or before Defendants terminated his employment did Defendants identify any bona fide dispute concerning Plaintiff's job performance, the agreed compensation structure, the services Plaintiff performed, or Plaintiff's entitlement to payment for work already completed.

202. Defendants accepted and retained the benefits of Plaintiff's services, including business development, customer acquisition, supplier relationships, contract negotiations, operational management, and strategic consulting, while knowingly failing to pay all compensation earned for those services. Defendants nevertheless continued to exploit the business opportunities generated through Plaintiff's efforts after his termination, including business connected to House of Epic and related opportunities.

203. Defendants' failure to maintain and produce payroll and compensation records further demonstrates the knowing and willful nature of their failure to pay earned wages.

204. As a direct and proximate result of Defendants' violations of Article 6 of the New York Labor Law, Plaintiff sustained unpaid wages and compensation, all damages recoverable under Article 6, and other damages in an amount to be determined at trial.

205. Pursuant to N.Y. Lab. Law § 198 and other applicable provisions of Article 6 of the New York Labor Law, Plaintiff is entitled to recover all unpaid wages and compensation, liquidated damages to the extent authorized by law, prejudgment interest where applicable, attorneys' fees, costs, disbursements, and such other and further relief as the Court deems just and proper.

## EIGHTH CAUSE OF ACTION

**Civil RICO 18 U.S.C. §§ 1962(c), 1964(c)**

206. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

207. Upon information and belief, the enterprise consisted of an association-in-fact among GBT, GBA, BLVD, affiliated entities, payment accounts, and Defendants Robert Fulton Rood IV and Gary Fiocco acting through those entities. The enterprise functioned as a continuing unit with the common purpose of conducting business, soliciting customers, obtaining labor, generating revenue, and concealing the true financial condition, ownership structure, control, and payment practices of the affiliated entities.

208. The enterprise had a structure and existence separate and apart from the individual Defendants and from the predicate acts alleged herein, including through continuing relationships among its members, centralized decision-making, coordinated financial activity, shared personnel, and the use of multiple entities and payment accounts to carry out its business.

209. Defendants Rood and Fiocco are the RICO persons who conducted and participated in the affairs of the enterprise.

210. Rood exercised primary operational and financial control over the enterprise, while Fiocco knowingly participated in its operation and management, including payroll administration, customer communications, vendor relationships, and financial transactions. Each Defendant participated, directly and indirectly, in the conduct of the enterprise's affairs.

211. Beginning no later than March 2024 and continuing through Plaintiff's termination and thereafter, Defendants knowingly devised and executed a scheme to obtain Plaintiff's labor, services, business relationships, supplier relationships, business development efforts, and the economic benefits derived therefrom, while avoiding their payroll and compensation obligations, by making materially false representations and material omissions concerning Plaintiff's compensation, the identity of the entity responsible for payment, the status of payroll reconciliation, the calculation of commissions and other compensation, and the status of payments allegedly owed.

212. As part of that scheme, Defendants knowingly and repeatedly represented that:

a. Plaintiff would be paid his agreed compensation, including salary, bonuses, commissions, and other earned compensation;

b. payroll deficiencies were temporary and would be promptly reconciled;

c. payments had been issued, routed or were in transit when they had not;

d. the affiliated entities would timely satisfy the compensation obligations owed to Plaintiff; and

e. that Plaintiff's earned compensation would be accurately calculated, documented, and paid once payroll records were reconciled.

213. Defendants knew these representations were false when made or made them with reckless disregard for their truth or falsity.

214. In furtherance of the scheme, Defendants repeatedly transmitted and caused to be transmitted interstate wire communications, including electronic mail, text

messages, telephone calls, electronic payroll communications, electronic banking transactions, Zelle transfers, PayPal transfers, and other electronic communications concerning Plaintiff's compensation, customer deposits, payroll reconciliation, vendor payments, product deliveries, and refunds.

215. Defendants also knowingly omitted material facts from their communications with Plaintiff, including the actual financial condition of the affiliated entities, the manner in which Plaintiff's compensation was being allocated among those entities, the status of payroll records and commission calculations, and the use of customer funds and business revenues in a manner inconsistent with Defendants' representations.

216. The foregoing mailings and interstate wire communications were not isolated events but formed part of Defendants' regular method of conducting the affairs of the enterprise. Through repeated communications concerning payroll, compensation, customer deposits, vendor payments, product deliveries, and financial obligations, Defendants allegedly directed, managed, and operated the enterprise in a manner designed to obtain labor, revenues, and other economic benefits while concealing the enterprise's true financial practices and avoiding payment obligations.

217. Plaintiff alleges that the interstate wire communications and mailings described above, including the representative communications identified in the Factual Allegations section of this Complaint, were made for the purpose of executing and advancing the fraudulent scheme alleged herein and constitute predicate acts of mail fraud and wire fraud within the meaning of 18 U.S.C. §§ 1341 and 1343, subject to proof at trial.

218. The predicate acts were related to one another because they shared common participants, common purposes, common victims, common methods of commission, and common results.

219. The pattern extended for more than a year, involved repeated communications with Plaintiff and multiple customers, utilized multiple affiliated entities, and constituted Defendants' regular method of conducting affairs of the Enterprise.

220. Plaintiff relied upon Defendants' repeated representations by continuing to perform executive-level services, generating customers, maintaining customer relationships, refraining from pursuing immediate legal remedies, all while Defendants continued to assure Plaintiff that compensation would be paid and reconciled.

221. As a direct and proximate result of Defendants' pattern of racketeering activity, Plaintiff suffered injury to his business and property, including unpaid salary, bonuses, commissions, and other earned compensation; unreimbursed business expenses; and damage to the economic value of Plaintiff's customer relationships, goodwill, and future business opportunities.

222. Defendants' violations of 18 U.S.C. § 1962(c) were a direct and proximate cause of Plaintiff's injuries.

223. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover threefold the damages sustained, together with the costs of suit, reasonable attorneys' fees, pre- and post-judgment interest where permitted, and such other and further relief as the Court deems just and proper

## NINTH CAUSE OF ACTION

### Civil RICO Conspiracy 18 U.S.C. § 1962(d)

224. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

225. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

226. Defendants knowingly and intentionally agreed to participate in the conduct of the enterprise's affairs through a pattern of racketeering activity, including the predicate acts of mail fraud and wire fraud alleged above.

227. In furtherance of that agreement, Defendants coordinated their roles in payroll routing, payment communications, customer-deposit solicitations, delivery and refund communications, vendor communications, and the use of affiliated entities and payment accounts to obscure the true source, recipient, and

obligor of funds and to conceal the status of customer deposits, deliveries, and refunds

228. Defendants agreed that the members of the enterprise would use interstate mail and wire communications to misrepresent compensation, payment timing, payment routing, customer deposit handling, delivery status, refunds, and financial capacity, and to reinforce those misrepresentations when Plaintiff questioned nonpayment, requested records, or challenged the handling of customer funds and compensation.

229. Defendants knowingly adopted and furthered a common scheme in which Plaintiff would be induced to continue performing services, generating customers, maintaining customer relationships, and representing Defendants to customers while earned compensation remained unpaid and financial responsibility was shifted among affiliated entities, including after Plaintiff's termination.

230. By agreeing to and facilitating the predicate acts described in the preceding paragraphs, Defendants conspired to violate 18 U.S.C. § 1962(c) within the meaning of 18 U.S.C. § 1962(d).

231. As a direct and proximate result of Defendants' RICO conspiracy, Plaintiff suffered the injuries to business and property alleged above, including unpaid compensation, unreimbursed expenses, lost commissions, and the economic value of Plaintiff's customer relationships and business opportunities.

232. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover threefold the damages sustained, together with the costs of suit, reasonable attorneys' fees, pre- and post-judgment interest where permitted, and such other and further relief as the Court deems just and proper.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands judgment against all Defendants, jointly and severally to the fullest extent permitted by law, and requests that the Court enter judgment in his favor and grant the following relief:

A. Award compensatory damages in an amount to be determined at trial, including unpaid salary, wages, commissions, bonuses, earned incentive compensation, unreimbursed business expenses,

lost compensation, and the economic value of customer relationships, supplier relationships, business opportunities, and goodwill wrongfully retained or exploited by Defendants, together with all other recoverable economic damages established at trial;

B. Award all wages, statutory damages, liquidated damages, treble damages where authorized, attorneys' fees, costs, and other relief available under the Maryland Wage Payment and Collection Law, New York Labor Law Article 6, and any other applicable statute pleaded herein;

C. Award treble damages pursuant to 18 U.S.C. § 1964(c), together with reasonable attorneys' fees and costs, for injuries to Plaintiff's business and property resulting from Defendants' violations of 18 U.S.C. §§ 1962(c) and (d);

D. Award punitive and/or exemplary damages to the extent authorized by applicable law on Plaintiff's fraud claims and any other claim for which such damages are legally recoverable;

E. Enter an order directing Defendants to render a full and complete accounting, including all payroll records, payroll registers, payroll journals, commission statements, commission calculations, payout participation calculations, reimbursement records, general ledger entries, bank records reflecting compensation payments, customer payments, customer deposits, revenues, intercompany transfers, accounting records, customer relationship management records, and all other books and records necessary to determine the full amount of compensation and other monies owed to Plaintiff, to the extent the Court determines such equitable relief is appropriate;

F. Disregard the corporate forms of the Defendant entities, pierce the corporate veil where warranted by the evidence, and hold the appropriate Defendants jointly and severally liable. In the alternative, determine that the Defendant entities operated as joint employers, an integrated enterprise, alter egos, and/or a single business enterprise to the extent supported by the evidence and applicable law.;

G. Award pre-judgment and post-judgment interest as permitted by applicable law;

H. Award Plaintiff the costs of this action, reasonable attorneys' fees, expert witness fees where recoverable, taxable costs, and all other litigation expenses authorized by statute, contract, or other applicable law;

I. Award such declaratory, equitable, or other relief as the Court deems just and proper, including any additional equitable relief necessary to effectuate the Court's judgment and prevent frustration of the relief awarded;

J. Grant such other and further legal or equitable relief as the Court deems just, proper, and equitable.

DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable as of right.

Dated: July 30, 2026

/s/ Eric S. Landau
Eric S. Landau, Esq.
Attorney for Plaintiff
Law Office of Eric S. Landau
50 Fountain Plaza, Suite 1400
Buffalo, NY 14202
Tel: (718) 440-6723
ericslandau@gmail.com

VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I, Yehuda "Jay" Adams, declare as follows:

I am the Plaintiff in the above-captioned action.

I have read the foregoing Complaint and know the contents thereof. The factual allegations contained in the Complaint are true and correct based upon my personal knowledge, except as to those matters alleged upon information and belief. As to those matters, I believe them to be true based upon information presently available to me, including documents, communications, business records, and other information obtained during my employment and thereafter.

This Verification is made pursuant to 28 U.S.C. § 1746.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30th day of July, 2026,

Yehuda "Jay" Adams